UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LAURENCE FENTRISS,

     Plaintiff,

v.                                  CASE NO. 8:15-cv-2675-T-23MAP

GATEWAY BANK FSB, et al.,

     Defendants.

_____/

## ORDER

Before her imprisonment for conspiring to defraud Gateway Bank, former

Gateway president Poppi Metaxas persuaded Laurence Fentriss to solicit partners for

Gateway's "Quick$ale" program. Under the program, a mortgage lender sold a

recent mortgage to Gateway, which promptly re-sold the mortgage to Fannie Mae,

Freddie Mac, or another institution. In some instances, rather than selling the

mortgage outright Gateway sold a participation to another institution. The part-sale

arrangement freed a mortgagee's capital and permitted the mortgagee to lend money

to another consumer. In theory, Gateway profited from Quicksale by collecting

servicing fees and interest during Gateway's brief ownership of the mortgage.

Gateway contracted with a third party, Cenlar, to service Gateway's mortgages.

By prohibiting Gateway's ownership of too many mortgages at the same time,

federal regulations administered by the Office of the Comptroller of the Currency

complicated Gateway's effort to rapidly expand Quicksale. To expand the program,

Metaxas searched for more banks to buy or to participate in the Quicksale mortgages. (The more participants in the program, the quicker Gateway could sell a mortgage). In 2003, Metaxas approached Anderson & Strudwick, Fentriss's former employer, about Fentriss's soliciting new Quicksale partners. In a March 6, 2003 agreement, A&S agreed to solicit banks for the Quicksale program, and Gateway agreed to pay two-tenths of a percent of the "average balance outstanding to banks referred by A&S." (Doc. 93-9 at 2) The one-paragraph agreement mentions nothing about cancellation.

When Fentriss left A&S in 2008 to open a consulting firm (CBIA Advisors, which changed its name to Tier One Partners), A&S assigned the contract to Fentriss. (Doc. 16-2) The record shows that Gateway knew about, and acquiesced in, the assignment. From 2008 until October 2013, Gateway continued to pay Fentriss for finding Quicksale partners. On some occasions, Gateway paid Tier One Partners at Fentriss's instruction. (Doc. 75 at 3–4)

Gateway's finances deteriorated after 2008. In October 2011 Gateway and the OCC agreed to a consent order, which required, among other items, that Gateway raise money. To raise money, Gateway prepared a stock offering for June 2013. In anticipation of the offering, Gateway prepared in September and December 2012 two "private placement memorandums" (Doc. 94-9), which showed an accumulated deficit of $11,686,207 for the fiscal year ending June 30, 2012. Despite the bank's

unprofitability, the board believed that stringent management could return the bank to profitability, but Gateway's fundraising effort initially generated little money.

Gateway attributes the difficulty in raising money to Fentriss's presence on Gateway's board. In addition to serving as a Gateway director, Fentriss served on the board of Progress Bank of Florida, which failed in 2010. In October 2013, the FDIC sued Fentriss and Timothy Anonick (a Gateway director and Fentriss's business partner) to recoup more than $6.3 million in losses sustained by the FDIC as a consequence of Progress Bank's failure. *Case no.* 8:13-cv-2692-RAL (M.D. Fla. Oct. 18, 2013). But before suing Fentriss, the FDIC threatened to assert a "cross-guaranty" against Gateway. When two banks share the same management or ownership, in some circumstances a cross-guaranty permits the FDIC to recoup from one bank's assets the losses resulting from the other bank's failure. Unsurprisingly, the impending prospect of a cross-guaranty deterred investors from buying Gateway's shares.

Although Fentriss insists that the FDIC could not lawfully impose on Gateway a cross-guaranty based on Progress Bank's failure, Gateway feared that challenging the cross-guaranty would require lengthy and costly litigation. Jim Keefe, Gateway's current chairman and a Gateway director since 2010, believes that suing the FDIC over the cross-guaranty "would have led . . . to the immediate closure of Gateway Bank." (Keefe Depo. at 105) The FDIC offered Gateway an opportunity to avoid the cross-guaranty: If Gateway removed Fentriss and Anonick

from the board or persuaded Fentriss and Anonick to resign, the FDIC would waive the cross-guaranty.

Sometime in 2012, Gateway asked Fentriss to resign as a director. Fentriss alleges that, in exchange for Fentriss's resignation, Gateway agreed to modify the A&S contract to increase Fentriss's pay. The parties exchanged several e-mails about modifying the contract, and the record includes several draft agreements. (Doc. 91-1 at 169–180) Protracted negotiations failed to produce a written agreement about Fentriss's compensation for soliciting a Quicksale partner, but Fentriss alleges that Gateway orally agreed to pay Fentriss at least $12,000 a month under an "automatically renewing" one-year contract. Fentriss resigned as a director on July 13, 2012. In November 2013, the month after the FDIC sued Fentriss, Gateway cancelled the arrangement and stopping paying Fentriss. (Doc. 94-7) In April 2015, Gateway ended the Quicksale program.

Fentriss and Gateway both profess a willingness to sign a written contract and blame the other for the failure to reduce the purported agreement to writing. Neither Fentriss nor Gateway is without some support in the record. Jim Baxter, a Gateway director, instructed Jeff Cheung (Gateway's former CEO) to tell Fentriss and Anonick "not to email this stuff any more. Just remind [Fentriss and Anonick] that if this ever comes down to something that's investigated, we're going to have to look through all these emails." (Doc. 93-14 at 53) Anonick states that Gateway "was trying to hide the agreement from the FDIC and so that's why they were hesitant to

sign it or never did sign it."  (Anonick Depo. at 25)  Conversely, Cheung states that Fentriss refused to sign a written agreement.  (Cheung Depo. at 32–33)

Fentriss sues (Doc. 16) Gateway, Keefe, and Cheung for $3.168 million based on Gateway's failure to pay money allegedly owed under the oral contract.  Fentriss calculated the demand by multiplying $12,000 times Fentriss's life expectancy in months.  (Fentriss Depo. at 134)  Based on his "good health," Fentriss estimates that he will live for another twenty-two years (or two-hundred and sixty-four months).  (Fentriss Depo. at 134)  Additionally, Fentriss claims that Gateway's oral promise of a $12,000 monthly payment fraudulently induced Fentriss to resign from the board.

Finally, Fentriss claims "fraud in the sale of securities."  In June 2013 Fentriss bought $250,000 of Gateway stock; in late 2013 or early 2014, an audit of Gateway's finances showed that Cenlar, the third party that serviced Gateway's mortgages, owed Gateway about $1.1 million less than Gateway originally believed.  In 2014, Gateway re-stated its finances to adjust for the accounting error.

Counter-claiming (Doc. 74) for rescission of both the oral contract and the 2003 contract, Gateway alleges that the agreements violate 12 C.F.R. § 160.130, which prohibits a bank director's receipt of "any commission, fee, or other compensation in connection with the procurement of any loan made by the savings association."  Additionally, Gateway alleges that a majority of disinterested directors failed to approve the contracts, which failure purportedly renders the contracts voidable under the California Corporations Code.  Asserting that the payments

unjustly enriched Fentriss and Tier One, Gateway impleads (Doc. 74) Tier One, to which Fentriss directed payments from Gateway, and requests re-payment of at least $208,126.59 that Gateway paid Tier One at Fentriss's request between February 2009 and July 13, 2012.

## DISCUSSION

### I. Breach of oral contract

Both parties analyze the breach-of-contract claim under both Florida and California law, but neither party argues for the application of a particular state's law. Florida's choice-of-law adopts the law applicable at the place the parties executed the contract.[1] *Lanoeu v. Rizk*, 987 So. 2d 724, 727 (Fla. 3d DCA 2008) ("Florida adheres to . . . *lex loci contractus*," which "looks to [] where the contract was executed."); *see also Sturiano v. Brooks*, 523 So. 2d 1126 (Fla. 1988) (rejecting a "significant relationship" test to determine the governing law in an action based on the breach of an insurance contract). Although no Florida decision appears to decide the place of execution for an oral contract, the execution of a written contract occurs "where the last act necessary to make a binding agreement takes place." *D.L. Peoples Grp., Inc. v. Hawley*, 804 So. 2d 561, 563 (Fla. 1st DCA 2002) (collecting decisions).

---

[1] *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941), requires employing the same choice-of-law analysis that Florida employs, and Florida ordinarily decides choice-of-law questions. *See, e.g.*, *Jemco, Inc. v. United Parcel Serv., Inc.*, 400 So. 2d 499 (Fla. 3d DCA 1981) (deciding a choice-of-law question); *Fioretti v. Mass. Gen. Hosp.*, 53 F.3d 1228 (11th Cir. 1995) (applying Florida's choice-of-law analysis).

The final act necessary to create a contract was Fentriss's acceptance of Gateway's proposal, but time and circumstance have caused uncertainty about the place of acceptance. Fentriss and Keefe discussed modifying the 2003 contract while dining at a San Francisco restaurant (Doc. 103-5 at 9), but both parties agree that the dinner discussion yielded no agreement.[2] According to Fentriss, the parties finalized the oral contract during the July 13, 2012 board meeting. Although Gateway's office is in Oakland, California, several directors lived elsewhere, and "most people attended by telephone." (Fentriss Depo. at 59–60) Fentriss resided in Florida on the day of the meeting and attended telephonically but cannot remember where "[he] was on that day." (Fentriss Depo. at 60)

No party presents a flight itinerary, a hotel reservation, or other documentation to establish Fentriss's location during the July 13, 2012 meeting. Because nothing in the record shows that Fentriss participated in the meeting from outside Florida or otherwise defeats the inference that Fentriss remained at home during the call, Florida law applies. Even if the choice-of-law analysis suggested California law, Gateway concedes that the California courts consider California's statute of frauds procedural, not substantive, a concession that compels applying Florida's statute of frauds. (Doc. 91 at 10 n.2)

---

[2] Fentriss states that Keefe and he agreed "in concept" to amend the Quicksale contract but that night "we never got down to a specific hand[-]shake" or to approving a modification. (Fentriss Depo. at 76)

The parties disagree whether Fentriss's breach-of-oral-contract claim is barred by Florida's statute of frauds, which prohibits an action on an oral agreement not susceptible to performance within one year.[3] Fentriss describes the contract as "a one-year agreement" that "would be renewed by the board at the end of each year automatically." (Fentriss Depo. at 52) Fentriss insists that this "evergreen" provision required Gateway to automatically renew the contract every July and prohibited terminating the contract for any reason. (Fentriss Depo. at 49–56) Asked to identify a circumstance in which Gateway could lawfully end the agreement, Fentriss responded, "I don't know of any." (Fentriss Depo. at 56)

Fentriss correctly argues that the statute of frauds excludes a contract susceptible to performance within one year even if the contract includes no definite term. For example, in *Browning v. Poirer*, 165 So. 3d 663 (Fla. 2015), the parties orally agreed in 1993 to split the prize from a winning lottery ticket. In 2007, the defendant won $1 million but refused to share the prize, and the plaintiff sued for breach of the oral contract. *Browning* holds that the statute of frauds creates no bar to recovery because the parties could perform within a year. 165 So. 3d at 666 ("If [a party] purchased a winning lottery ticket and they split the proceeds before the expiration of one year, the agreement would have been fully performed.").[4]

---

[3] Section 725.01, Florida Statutes.

[4] Although *Browning* exempts from the statute of frauds an oral contract susceptible to performance within one year, the decisions consistently find that the statute of frauds bars a claim where the parties maintained an "ongoing" business relation. *See, e.g., LynkUs Comms., Inc. v. WebMD Corp.*, 965 So. 2d 1161 (Fla. 2d DCA 2007) (Canady, J.) (collecting decisions); *Khawly v.*

(continued...)

Gateway submits a compelling argument that the parties could not perform the oral agreement alleged by Fentriss within one year. A perpetual "one-year" contract requiring the defendant's mechanical renewal every July is not susceptible to performance within one year, a fact confirmed by Fentriss's deposition. Fentriss asserts that Gateway breached the oral contract not only by failing to pay Fentriss from November 2013 through July 2014 but also by failing to pay Fentriss from July 2014 to July 2015; from July 2015 to July 2016; and from July 2016 to July 2017. More troubling, Fentriss requests damages for Gateway's prospective failure to pay Fentriss from July 2017 until at least July 2036. No Florida decision — and for that matter, no reported decision in any other state — permits a plaintiff to recover two decades of payments for the defendant's breach of an "automatically" or perpetually renewing, one-year, oral contract. The statute of frauds prohibits Fentriss's claiming that the one-year term exempts the oral contract from the statute of frauds while simultaneously (but irreconcilably) demanding damages for twenty-two years of prospective payments.

Although the statute of frauds precludes Fentriss's recovering under the oral contract for the expected remainder of his life, the statute of frauds is inapplicable to a single renewal of a one-year contract. In *Grossman v. Levy*, 81 So. 2d 752 (1955), the

---

[4](...continued)
*Reboul*, 488 So. 2d 856 (Fla. 3d DCA 1986) (holding that the statute of frauds barred recovering under an oral contract where "the parties intended to establish an ongoing concern, to extend well beyond a year."); *Tobin & Tobin Ins. Agency, Inc. v. Zeskind*, 315 So. 2d 518 (Fla. 3d DCA 1975).

defendant contracted on October 12, 1952, to hire the plaintiff for one year under a contract that permitted renewal. On October 12, 1953, the parties renewed the contract for one year, but the defendant laid-off the plaintiff on December 29, 1953. Because the parties could perform within one year of the contract's commencement, the plaintiff could recover the money owed for the remaining months of the plaintiff's employment. *Grossman*, 81 So. 2d at 752; *accord Rubenstein v. Primedica Healthcare, Inc.*, 755 So. 2d 746 (Fla. 4th DCA 2000) (holding that a plaintiff stated a claim for breach of a renewed one-year oral contract). In this instance, nothing in the statute of frauds appears to prohibit Fentriss's recovering damages for the missed payments between November 2013 and July 2014.

At least one genuine dispute of material fact precludes summary judgment for either party on the breach-of-contract claim. Fentriss testifies that Gateway agreed to pay a minimum of $12,000 monthly under a one-year oral contract that renewed in July 2013. Conversely, Keefe and Gateway deny agreeing to the $12,000 monthly payments. Although Cheung recalls (vaguely) a tentative agreement in which Gateway would pay Fentriss a minimum of $12,000 monthly (Cheung Depo. at 23–28), Cheung testifies that the agreement required a written contract and that Gateway paid the monthly minimum on an interim basis only as a gesture of "good faith." (Cheung Depo. at 24–25, 29) Additionally, Noel Kullavanijaya (a former Gateway director) testifies that he never approved an oral agreement between Gateway and Fentriss. (Kullavanijaya Depo. at 31) The conflicting testimony of

Fentriss, Keefe, Cheung, and Kullavanijaya creates a genuine dispute about whether Gateway agreed to pay Fentriss at least $12,000 monthly under an oral contract.[5]

Finally, Keefe and Cheung correctly argue that a "corporation is a legal entity separate and distinct from its" directors and that Fentriss identifies no basis to subject Keefe and Cheung to personal liability for Gateway's alleged breach of contract. (Doc. 91 at 11) Fentriss fails to respond to Keefe and Cheung's argument. Because the "corporate form" protects Keefe and Cheung from liability in this instance, Keefe and Cheung are entitled to summary judgment on the breach-of-contract claim.

## II. Fraud in the inducement

Fentriss claims that Gateway's promise of an oral agreement induced Fentriss to resign from the board. Several disputes of material fact preclude granting summary judgment for Fentriss. As explained above, Gateway denies agreeing to pay Fentriss $12,000 monthly, and a jury must resolve the factual dispute about Gateway's alleged promise. Also, Fentriss submits no evidence about Gateway's scienter. Although Fentriss excerpts several comments from a July 11, 2012 conference call among Gateway's directors (Doc. 93-14), Gateway responds

---

[5] Fentriss correctly observes that the defendants' motion for summary judgment includes no argument about the 2003 written agreement. If a jury finds that Gateway breached the written agreement, Fentriss might recover about $19,000 (Doc. 94-8 at 3) unless Gateway proves that a majority of disinterested directors or shareholders never approved, authorized, or ratified the 2003 agreement. (See Section V)

persuasively that the excerpts involve Fentriss's board fees, a topic different from the alleged promise.[6]

### III. Fraud in the sale of securities

Fentriss bought $250,000 of Gateway stock in June 2013. After an audit revealed that Cenlar, the third party that serviced Gateway's mortgages, owed Gateway about $1.1 million less than Gateway originally believed, Gateway re-stated its value in October 2014. Suing for "fraud in the sale of securities," Fentriss claims that the 2012 private placement memorandums — both of which contained the accounting error that Gateway remedied in October 2014 — induced Fentriss's investment in Gateway.

The parties disagree about the elements of the claim for "fraud in the sale of securities." Gateway interprets the claim as a common law fraud claim. Under Florida common law, success on a fraud claim requires proof that the defendant knowingly misrepresented or omitted a material fact, that the defendant intended the plaintiff's reliance on the misrepresentation or omission, that the plaintiff reasonably relied on the misrepresentation or omission, and that the plaintiff suffered consequent harm. *See, e.g.*, *Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984) (stating the elements of fraud).

---

[6] Also, Fentriss offers no argument about damages on the fraudulent-inducement claim, but a plaintiff may not circumvent the statute of frauds by labeling a claim for breach of an oral contract as a claim for fraud. *Canell v. Arcola Housing Corp.*, 65 So. 2d 849 (Fla. 1953); *Puff 'N Stuff of Winter Park, Inc. v. Bell*, 683 So. 2d 1176 (Fla. 5th DCA 1996).

Conversely, Fentriss contends that the claim arises under Section 517.301, Florida Statutes, which requires no proof of a knowing misstatement or omission. Also, unlike a common law fraud claim or a Rule 10b-5 claim, a claim under Section 517.301 requires no proof that the defendant's misstatement caused a diminution in the value of the plaintiff's security. *E.F. Hutton & Co., Inc. v. Rousseff*, 537 So. 2d 978 (Fla. 1989). Additionally, Fentriss analyzes the claim under Rule 10b-5.[7] In sum, the claim for "fraud in the sale of securities" might arise under Florida common law, under Section 517.301, or under Rule 10b-5. The defendants move (Doc. 107) to "strike" any mention of Section 517.301 and Rule 10b-5, and Fentriss opposes (Doc. 112) the motion.

The amended complaint (Doc. 16), which Fentriss submitted without the aid of counsel, mentions neither Section 517.301 nor Rule 10b-5. Likewise, the proposed amended complaint repeats the phrase "fraud in the sale of securities" but mentions neither Section 517.301 nor Rule 10b-5.[8] Fentriss contends the July 28, 2017 order (Doc. 83) "found that fraud in the sale of securities had already been sufficiently plead [sic]." (Doc. 112 at 8) In fact, the July 28 order says nothing about whether Fentriss states a claim for fraud (the defendants never moved to dismiss for failure to plead fraud with particularity). In any event, Fentriss's argument skirts the dilemma:

---

[7] Oddly, the parties' analysis depends on Rule 10b-5 precedent from the Ninth Circuit, even though the precedent of the Eleventh Circuit governs in the Middle District of Florida.

[8] A July 28, 2017 order (Doc. 83) denies leave to amend the complaint.

The parties agree that Fentriss alleges "fraud in the sale of securities" but disagree about the identity and source of the claim.

*Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346 (2014), offers little guidance in resolving this disagreement. In *Johnson*, several plaintiffs sued for a civil-rights violation but failed to cite Section 1983, which failure resulted in the dismissal of the complaint for failure to cite Section 1983. Affirming the dismissal, the Fifth Circuit identified one consequence of the plaintiffs' failure to cite Section 1983: the City of Shelby could not assert qualified immunity. Vacating the Fifth Circuit's decision, *Johnson* explains that Rule 8(a)(2) requires only a "short and plain statement" of the facts. Also, *Johnson* states that neither *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), nor *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), requires citing the statute under which the plaintiff sues. But *Johnson* observes that no "heightened pleading rule" applies to a claim for a civil-rights violation.

The most sensible interpretation of *Johnson* is a prohibition against dismissing a civil-rights complaint based on a technicality (the failure to cite Section 1983) when the defendant and the district judge almost certainly understood that the plaintiffs sued under Section 1983. Equally important, the defendant in *Johnson* suffered no prejudice from the plaintiffs' failure to cite Section 1983. *See Johnson*, 135 S. Ct. at 347 (explaining that the Fifth Circuit's mention of qualified immunity "displays some confusion in the Fifth Circuit's perception of the petitioners' suit"). At most, *Johnson* prohibits the dismissal of a complaint based on a technicality when the

defendant can readily identify the plaintiff's claim and when the defendant suffers no prejudice from the plaintiff's failure to cite the governing statute.

In this action and unlike in *Johnson*, at least two "heightened pleading requirements" govern the plaintiff's claim. First, Rule 9(b) requires pleading fraud with particularity. Second, to the extent Fentriss attempts to sue for a violation of Rule 10b-5, the Private Securities Litigation Reform Act requires Fentriss to detail "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." Additionally, the PSLRA requires Fentriss to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296–97 (11th Cir. 2011) (quoting 15 U.S.C. § 78u–4(b)).

The complaint fails for at least two reasons to state a claim for a violation of Rule 10b-5. First, Fentriss alleges generally that the defendants' "Board reports, FDIC call reports and other documents" misled Fentriss, but the PSLRA requires specifying each misleading statement and explaining what renders the statement misleading. Second, the PSLRA requires Fentriss to allege with particularity facts that strongly suggest the defendants' knowledge of, or reckless indifference to, the falsity of the statements. Excluding conclusory allegations (for example, paragraph twenty-one of the complaint), no well-pleaded and specific facts show the defendants' scienter. Because Fentriss neither mentions Rule 10b-5 in the complaint nor pleads

facts sufficient to state a claim under Rule 10b-5, Fentriss cannot litigate under Rule 10b-5.[9]

Additionally, Gateway argues persuasively that permitting a Section 517.301 claim prejudices Gateway. Both parties agree that a defendant's negligence can establish a Section 517.301 claim.[10] In contrast, common law fraud requires a knowing misrepresentation or omission. *See, e.g.*, *First Interstate Dev. Corp. v. Ablenedo*, 511 So. 2d 536, 539 (Fla. 1987). Because Fentriss admitted (Doc. 91-1 at 95) a belief that Gateway acted negligently in failing to confirm the company's accounts receivable —an admission that forecloses a common law fraud claim — Gateway elected not to conduct discovery about whether negligence contributed to Gateway's accounting error. Discovery on a Section 517.301 claim likely would require deposing Green and Gateway's other financial officers to inquire about Gateway's diligence in monitoring and valuing accounts receivable. Additionally, discovery might require Gateway to retain an accounting expert to review Moss-Adams's audit. Because discovery closed long ago, Gateway cannot depose the witnesses or retain the experts necessary to defend a Section 517.301 claim.

---

[9]Also, Local Rule 3.01(b) requires a party who opposes a motion to submit a memorandum in opposition. Although Fentriss's response (Doc. 112) discusses Section 517.301, the response includes no discussion about Rule 10b-5. Under Local Rule 3.01(b), this order treats as unopposed the motion to exclude mention of Rule 10b-5.

[10] Gateway contends that negligence establishes a claim under Section 517.301. (Doc. 107 at 4–5) Fentriss agrees with Gateway's contention: "[T]he scienter requirement under Florida law is satisfied by [a] showing of *mere negligence*." (Doc. 112 at 9) (italics original) (citing *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1046 (11th Cir. 1987)).

If Fentriss preferred to pursue a claim under Section 517.301, Fentriss should have alleged in the complaint a claim under Section 517.301 or moved timely to amend the complaint. After years of litigating this action as a common law fraud claim without mentioning Section 517.301, Fentriss cannot desperately invoke the statute to avoid summary judgment. Because the complaint fails to notify the defendants about a claim under Section 517.301 and because the tardy assertion of a claim under Section 517.301 prejudices the defendants, this order analyzes the "fraud in the sale of securities" claim under Florida's common law of fraud.[11]

Fraud requires a knowing misrepresentation, but no evidence shows that the defendants knowingly misrepresented Gateway's value. As explained above, Fentriss believes that negligence caused the accounting error that prompted the restatement. (Fentriss Depo. at 30) Fentriss's belief that the defendants would have learned about the accounting error through the exercise of due diligence conflicts irreconcilably with Fentriss's claim that the defendants knowingly misrepresented

---

[11] Three arguments warrant brief attention. First, Fentriss contends that Fentriss's mention at the deposition of a claim for "fraud in the sale of securities" (Fentriss Depo. at 30) notified the defendants about a Section 517.301 claim. As explained above, Fentriss's mention of "fraud in the sale of securities" provides no aid in resolving the dispute about the source and elements of the claim. Second, Fentriss argues that the defendants "have had the opportunity to use the discovery tools available in the Federal Rules of Civil Procedure to obtain the details of why and how Fentriss contends he is entitled to rescission." (Doc. 112 at 4) If Fentriss knew about Section 517.301, Fentriss should have mentioned the statute; if Fentriss knew nothing about the statute, discovery was futile. Third, Fentriss argues that the complaint's mention of rescission "clearly" notified the defendants of a Section 517.301 claim. (Doc. 112 at 5) But rescission is a remedy available to a common law fraud claim. *See, e.g.*, *Restatement (Third) of Torts*, § 549, comment E ("Alternative remedies. One who is misled by the fraudulent representations of another may rescind the transaction induced by it."); *Townsend v. Morton*, 36 So. 2d 865 (Fla. 5th DCA 2010).

Gateway's value.[12]  Additionally, the record uniformly shows that the defendants discovered the accounting error in late 2013 or in 2014, several months after Fentriss bought the stock.  (For example, Keefe Depo. at 185)  The absence of evidence that the defendants knowingly misrepresented Gateway's value compels summary judgment for the defendants on the claim for "fraud in the sale of securities."

## IV. The Treasury regulation

Gateway contends that the 2003 contract and the alleged oral contract violate 12 C.F.R. § 160.130, which prohibits a bank director's receipt of "any commission, fee, or other compensation in connection with the procurement of any loan made by the savings association."

Moving (Doc. 95) for summary judgment on Gateway's counterclaims, Tier One argues that the Gateway-A&S and Gateway-Fentriss arrangements comply with Section 160.130.  Tier One's argument appears correct for at least two reasons.  First, Gateway compensated Fentriss and Tier One not for "procur[ing]" a loan but rather for securing a Quicksale partner who bought a mortgage from Gateway.  According to Gateway, a "Quicksale partner" means a bank to which Gateway sold a mortgage, not a bank from which Gateway bought a mortgage.  (Doc. 106 at 4)  *Black's Legal Dictionary* defines procurement as "the act of getting or obtaining something."  *Black's*

---

[12] Even if a defendant's negligence could establish liability for fraud, Fentriss, who cannot explain the cause of the overstatement (Fentriss Depo. at 95), fails to identify facts sufficient to create a genuine dispute about negligence. In this circumstance, Fentriss's conclusory and unsubstantiated assertion that negligence caused the overstatement cannot defeat summary judgment. *See, e.g.*, *Ellis v. England*, 432 F.3d 1321 (11th Cir. 2005) (holding that "mere conclusions and unsupported factual allegations are legally insufficient to defeat [] summary judgment").

*Legal Dictionary* at 1244 (8th ed. 2004). When Gateway "procure[d]" a mortgage from a lender, Fentriss received no commission; rather, Fentriss received a commission only if Gateway sold the mortgage to a "partner bank." A payment based on Gateway's sale of a mortgage is not a payment for Gateway's "procur[ing]" a mortgage. Second, Tier One argues persuasively that a mortgage lender, not Gateway, "made" each loan. Because Gateway provided Fentriss no compensation for "procur[ing]" a loan "made" by Gateway, Section 160.130 provides Gateway no basis to recoup money from Fentriss or Tier One. Even if Gateway's policy of substituting a "good" loan for a "bad" loan somehow converted the Quicksale transactions into "loans" rather than "sales" (Keefe Depo. at 24–25), a party who pays money under an illegal contract cannot successfully sue to recover the money. *See, e.g.*, *Restatement (Second) of Contracts*, § 197, comment A (explaining that, if a party sues under an illegal contract, the law "leave[s] both parties as it finds them, even though this may result in one of them retaining a benefit that he has received").

The lack of a regulatory objection to the arrangement (strongly) suggests no violation of Section 160.130. Keefe states "it would be most surprising if [Connie Welch, an OCC employee assigned to oversee Gateway's operation] was not aware" of Gateway's payments to Fentriss. (Keefe Depo. at 99) Keefe testifies that the OCC reviewed Gateway's financial statements each year and that the statements disclosed the Quicksale commissions. (Keefe Depo. at 53–54, 67–68) Similarly, Cheung testifies that Welch knew about Gateway's payments to A&S and Fentriss. (Cheung

Depo. at 12, 26–28)  No evidence shows that the OCC, which enforces Section

160.130, objected at any time to a Quicksale commission.

## V. The California Corporations Code

Additionally, Gateway contends that the payments "unjustly enriched" Tier

One and Fentriss because Gateway paid the money without the authorization,

approval, or ratification from a majority of disinterested Gateway directors.  Under

Section 310 of the California Corporations Code, a contract or transaction between

the corporation and a director is voidable unless:

> [T]he material facts as to the transaction and as to such director's
> interest are fully disclosed or known to the board or committee, and
> the board or committee authorizes, approves, or ratifies the contract or
> transaction in good faith by a vote sufficient without counting [the
> interested director's vote] and the contract or transaction is just and
> reasonable as to the corporation at the time it is authorized, approved,
> or ratified.

California Corporations Code, Section 310(a)(2).  Even if a transaction lacks the

approval of a majority of disinterested directors, the transaction is neither void nor

voidable if the proponent of the contract's validity shows that the contract "was just

and reasonable as to the corporation at the time it was authorized, approved, or

ratified."  California Corporations Code, Section 310(a)(3).

Tier One argues that Gateway's board authorized the Gateway-A&S contract

in 2003, and Gateway responds that the board approved Quicksale commissions

generally but not the specific agreement between Gateway and A&S.  During the

July 31, 2003 board meeting, Metaxas proposed that Gateway pay a director for

"signing up these [Quicksale] clients."  (Doc. 93-10 at 6)  According to the minutes,

"[a]ny such arrangement would have to meet" five requirements, including a requirement that "[t]he full Board would have to approve of the arrangement (effected members abstaining), prior to adoption."  The minutes appear to show that the board approved a proposal similar to Metaxas's suggestion but eliminated the requirement that the board approve each agreement between Gateway and a director. Instead, the board permitted "management" (nothing in the record defines "management") to enter into a referral agreement with a director.

Even if "management" includes Metaxas, Gateway's president at the time of the Gateway-A&S agreement, nothing in Section 310 allows the board to delegate to "management" the authority to authorize, approve, or ratify a transaction in which a director maintains a financial interest.  On the contrary, the Corporations Code requires the approval of a majority of disinterested directors or shareholders.  Tier One and Fentriss fail to identify a vote in which the board or the shareholders approved, authorized, or ratified the 2003 contract, a failure that appears to validate Gateway's argument that the 2003 contract violates the Corporations Code.

Finally, the parties dispute whether a limitation bars Gateway's counterclaims for rescission against Fentriss and restitution against Tier One.  Because Gateway asserts a compulsory counterclaim against Fentriss, no limitation bars Gateway's counterclaim against Fentriss.  *See, e.g.*, *Stein v. Feingold*, 629 So. 2d 998 (Fla. 3d DCA 1993) ("There is no statute of limitation defense as to a compulsory counterclaim.") (collecting decisions).  And Gateway argues persuasively (Doc. 106

at 7–9) that no limitation bars the restitution claim against Tier One, to which Fentriss directed Gateway to send the payments owed to Fentriss under the 2003 contract.[13]  (Fentriss Depo. at 127)  Fentriss cannot preclude Gateway's recovery by instructing Gateway to pay a third-party company owned by Fentriss instead of paying Fentriss directly.

## CONCLUSION

The defendants' motion (Doc. 91) for summary judgment on the claims for breach of contract and "fraud in the sale of securities" is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Fentriss asserts, and Gateway denies, that Gateway orally agreed on July 13, 2012 to pay Fentriss at least $12,000 monthly for soliciting new Quicksale partners.  The conflicting testimony of Fentriss, Keefe, Cheung, and others creates a genuine dispute of material fact whether Gateway orally agreed to the payments and precludes summary judgment for either Gateway or Fentriss on the breach-of-oral-contract claim.  Because Fentriss identifies no basis for subjecting Keefe and Cheung to personal liability for the alleged breach of contract, Keefe and Cheung are entitled to summary judgment on the claim.  Also, the defendants are entitled to summary judgment on the claim for "fraud in the sale of securities." Fraud requires a knowing misstatement or omission, but no evidence shows that the defendants knowingly misrepresented Gateway's value.

---

[13] In any event, Gateway can recover from Fentriss the money paid under the 2003 contract because the contract obligated Gateway to pay Fentriss.

Additionally, the defendants' supplemental motion (Doc. 113) for summary judgment is **GRANTED**.  Even if Gateway orally agreed to pay Fentriss $12,000 each month, Florida's statute of frauds prohibits Fentriss's recovering for more than a year of missed payments.

Construed as a motion to exclude any mention at trial of Rule 10b-5 or Section 517.301 and to exclude proof of negligence, the defendants' motion (Doc. 107) is **GRANTED**.  Because Fentriss neither mentions Rule 10b-5 in the complaint nor states a claim under Rule 10b-5, Fentriss cannot litigate under Rule 10-b5.  The complaint fails to notify the defendants about a Section 517.301 claim, and Fentriss's tardy attempt to litigate under Section 517.301 prejudices the defendants.

Tier One's motion (Doc. 95) for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Nothing in 12 C.F.R. § 160.130 prohibits Gateway's arrangement with A&S, Fentriss, and Tier One.  But Tier One and Fentriss fail to identify a vote in which a disinterested majority of directors or shareholders authorized, approved, or ratified the 2003 contract.  Because Gateway alleges a compulsory counterclaim against Fentriss, no limitation bars Gateway's rescission claim against Fentriss.  Also, because Fentriss directed Gateway to pay Tier One instead of Fentriss, Tier One cannot escape liability based on the expiration of the limitation.  Finally, Fentriss's motion (Doc. 92) for summary judgment is **DENIED**.

The clerk is directed to set the action on the **JULY 2018** trial calendar.  No later than **JUNE 22, 2018**, the parties must submit the following papers:

(a) a trial brief with citations of authority and with argument of the disputed issues likely to arise at trial;

(b) a concise (preferably one paragraph) joint statement of the action for presentation to the venire;

(c) proposed jury instructions;

(d) proposed verdict forms; and

(e) proposed voir dire.

No later than **JUNE 25, 2018**, the parties must mediate before Peter Grilli.

ORDERED in Tampa, Florida, on March 27, 2018.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE